**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ajman Stud and Sheikh Ammar Bin Humaid Al Nuaimi,<br><br>        Plaintiffs,<br><br>v.<br><br>David Cains, Scott Bailey, and Stonewall Farms Arabians LLC,<br><br>        Defendants. | No. CV-15-01045-PHX-DJH<br><br>**ORDER** |

La Bella Versace was an Arabian horse of high pedigree and value.[1] Plaintiffs allege seven causes of action against Defendants arising from the sale and breeding of the then two-year-old La Bella Versace ("the Mare"). Plaintiffs claim that the Defendants never disclosed that the Mare was subject to a reserved embryo right. Plaintiffs claim they purchased the Mare from Defendants who, prior to delivering her, extracted and sold her embryos. Plaintiffs also allege that Defendants did not own the Mare at the time they accepted payment for her, and that Linda Koch[2] ("Koch") owned her. Plaintiffs claim that after receiving Plaintiffs' payment, Defendants purchased the Mare from Koch for the sole purpose of taking her embryos. Plaintiffs alleged seven claims against Defendants: (1) breach of contract; (2) breach of covenant of good faith and fair dealing, (3) fraud; (4)

---

[1] At time of trial, La Bella Versace was deceased, having lived only four-years. A probable result of being subjected to repeated artificial inseminations and embryo extractions in a quest for her prestigious offspring – an apparent routine practice in the Arabian horse industry.
[2] Laura Koch is not a named party in this case.

conversion of property rights; (5) breach of fiduciary duty; (6) breach of duties of bailment; and (7) declaratory relief. Plaintiff seeks monetary damages.

The parties proceeded to a six-day bench trial and thereafter submitted supplemental findings of fact and conclusions of law. (Docs. 128 & 129). The Court rules as follows:

## I.    FINDINGS OF FACT[3]

1. Ajman Stud is a business organized and licensed under the laws of the United Arab Emirates engaged in owning, breeding and marketing horses.  (Tr. Exh. 1).

2. Sheikh Ammar bin Humaid Al Nuaimi ("Sh .Ammar") owns Ajman Stud. (*Id*.)

3. Elisa Grassi  ("Grassi") and Frank Spönle ("Sponle") are Sh. Ammar's Agents. (SSOF).  Together, they manage the bloodstock of Ajman Stud and develop its breeding programs. (TR 1/8 at 5).

4. Grassi and Sponle are authorized to locate and negotiate the purchase of horses for Ajman Stud's breeding program. (*Id*. at 6)  They also prepare contracts for the purchase of horses for Ajman Stud on behalf of Sh. Ammar.  (*Id*.)

5. Scott Bailey ("Bailey") incorporated Stonewall Farms as a limited liability corporation under Arizona law A.R.S. § 29-632 as its sole owner and manager. (SSOF)(Tr. Exh. 260).

6. Stonewall Farms was formed with Bailey and David Cains' ("Cains") combined assets and created to buy, sell, show and breed Arabian horses.  (TR 1/16 at 10-11).

7. Stonewall Farms is on a five-acre horse property located at 28150 N. Alma School Parkway in Scottsdale, Arizona. (*Id*)(Tr. Exh. 260).

8. Bailey owns the home at Stonewall Farms.[4]   (TR 1/10 at 54).

---

[3] The facts are from trial testimony deemed credible by the Court and trial evidence (Doc. followed by date of testimony/evidence), the parties stipulated facts ("SSOF")(Doc. 80 at 4) and facts conceded by the parties during the pendency of the case. "TR" notes the trial transcript followed by the date of testimony and page number.  "Tr. Exh." notes the admitted trial exhibit by number.

[4] At time of trial, Stonewall Farms had been sold, it had no assets, except 10-15 horses, and Bailey arranged a three-month lease to permit Cains to continue residing there and for the

9. Bailey and Cains were in a romantic relationship from approximately 1990 through 2013 and they resided together in Bailey's home on Stonewall Farms. (TR 1/15 at 166).

10. On June 10, 2010, Bailey transferred Stonewall Farms to Cains and deemed him sole member and manager. (Tr. Exh. 261).

11. On July 5, 2012, Cains transferred Stonewall Farms back to Bailey and deemed him sole member and manager. (TR 1/10 at 108-109) (Tr. Exh. 262).

12. At time of trial, Stonewall Farms was owned by Bailey and Cains was its manager. (SSOF)(TR 1/10 at 101).

13. Bailey also owns Knight Media Networks, Inc., and iEquine Media Inc, web marketing services focused on the Arabian horse industry, which he operates from an office at Stonewall Farms. (TR 1/15 at 60)(Tr. Exh. 125).

14. Bailey and Cains use the home at Stonewall Farms for Bailey's business operations, and to show, train, buy and breed horses. They also hosted parties and rented the farm property out for events. (TR 1/10 at 54 & 1/16 at 22, 46).

15. Cains could not recall who oversaw Stonewall Farms books and records for the relevant time period. (TR 1/16 at 69).

16. Stonewall Farms primarily paid fees for repair, maintenance, improvements and landscaping of the entire property. (*Id.* at 47).

17. Bailey routinely purchased and titled equipment used to run Stonewall Farms because Stonewall Farms never established its own line of credit. (*Id.* at 50 -51).

18. In 2011 and 2012, Stonewall Farms' Chase checking account was in Bailey's name and Bailey signed all tax forms for Stonewall Farms. (*Id.* at 17).

19. In 2012, Bailey's primary income was from Knight Media Networks and Knight Media occasionally loaned funds to Stonewall Farms and vice-a-versa. (*Id.* at 24).

20. Cains was paid a salary by Stonewall Farms. (*Id.*)

---

remaining horses to stay on property. (TR 1/16 at 38).

21. In 2013 a judgment in the amount of $350,000.00 was entered against Cains and paid by Stonewall Farms and Cains. (*Id*. at 66), *See Markelle Arabians, LLC v. Gelbard, Brookville, Arabians LLC, and David Cains* CV 2009-005670. (TR 1/16 at 119)(Tr. Exh. 37 and 38).

22. The horse breeding, buying and selling decisions were mutually made by Bailey and Cains. (*Id*. at 123-124).

23. The Arabian Horse Association ["AHA"] requires that persons or entities doing business in the Arabian horse industry designate signature authority for AHA documents (Tr. Exh. 92).

24. Stonewall Farm has assigned Bailey and Cains as its authorized signatories with the AHA. (TR 1/10 at 43).

**The Parties' Relationship**

25. Bailey met Sh. Ammar in 2004 at a horse show and about one-year later began providing him with website services. (TR 1/16 at 4).

26. Bailey began selling horses to Sh. Ammar in approximately 2006 or 2008 and through 2013. (*Id*. at 5).

27. Bailey stated he only directly sold horses from Stonewall Farms to Sh. Ammar and Dubai Stud. (*Id*. at 42).

28. Cains met Sh. Ammar in 2007 and from 2008 through 2013 sold him approximately 15 horses. (*Id*. at 70).

29. Bailey described his relationship with Sh. Ammar as personal in nature. (*Id*. at 6).

30. Bailey described his relationship with Plaintiff's agent Grassi as "friends" (*Id*. at 28).

31. In 2012, Sh. Ammar owned Vervaldee, a Versace' stallion offspring that suffered from lymphangitis.[5] (TR 1/8 at 7). Lymphangitis caused Vervaldee's right hind

---

[5] While there was no testimony of the type of Lymphangitis suffered by Vervaldee, the

leg to become severely swollen and diminished his expected life-span.  (*Id*.)

32. Vervaldee was also a SCID[6] carrier, therefore, he could not be bred with another SCID carrier.  (*Id*. at 12)

33. Due to his illnesses, Vervaldee was shipped from the Emirates in Ajman to California for specialized care and breeding, and he was boarded near his veterinarian at Gallun Farms. (*Id*. at 8)

34. Bailey and Cains were familiar with Vervaldee, that he was ill and that his life-span due to illness was limited.  (TR 1/16 at 6-7, 107).

**Purchase of the Mare**

35. On February 20, 2012, Grassi received an email blast from Cains, on behalf of Stonewall Farms, offering a SCID clear two-year old Versace' daughter, "La Bella Versace" for $60,000.  (TR 1/8 at 10-11)(Tr. Exh. 271).

36. Grassi viewed a video of the Mare and consulted with Sponle who consulted Sh. Ammar.  Sh. Ammar agreed that the Mare would be a good breeding match for Vervaldee.  (TR 1/8 at 12).

37. On February 24, 2012, Grassi called Cains to express an interest in the Mare for Sh. Amar. (TR 1/8 at 15-16).

38. Cains told Grassi that he owned the Mare, that she was SCID clear and that she had never been bred.  (*Id*. at 16).

39. Grassi received approval from Sh. Ammar to purchase the Mare for breeding with Vervaldee.  (*Id*.)

40. On February 25, 2012, Grassi negotiated with Cains the purchase of the Mare (SSOF)(*Id*. at 12-13).

---

most common is Sporadic.  It is an inflammation of the lymph vessels most usually in the limbs and in the majority of cases, in the hindlimbs.  www.equine-vet.com (last visited August, 28, 2019.)

[6] Severe combined immunodeficiency disease ("SCID") is an autosomal, recessive hereditary disease occurring among Arabian horses.  https://www.ncbi.nlm.nih.gov/pubmed/9682449 (last visited August 28, 2019)

41. Grassi told Cains the Mare had to be CA[7] clear because Vervaldee is a CA carrier. (*Id.* at 16-17).

42. Grassi instructed Defendants that once payment was received and the CA test was clear, the Mare had to be moved to California to begin breeding with Vervaldee. (*Id.*)

43. Grassi states that during their February 24 conversation, Cains told her the Mare had not been bred and he did not disclose that she was subject to reserved embryo rights. (*Id.* at 16-17)

44. Grassi states that if Plaintiffs were aware of the Mares reserved embryos and prior breeding, Plaintiff would not have purchased her. (*Id.* at 16-17, 72)

45. Grassi and Cains arrived at a purchase price of $75,000.00 which included a $15,000 .00 commission fee for Grassi and Sponle. (*Id.* at 16 -17)

46. Grassi wrote the sales contract, affixed Sh. Ammar's name and emailed it to Cains on February 25, 2012. (*Id.* at 16, 21) (Tr. Exhs. 4 & 5).

47. Cains denied receiving Grassi's contract and claims that he drafted and sent Grassi a contract but he could not find corresponding communications supporting that statement. (TR 1/10 at 61)(Tr. Exh. 17).

48. On February 25, 2012, Cains replied to Grassi's email informing her that a vet would examine the Mare "today to do the prepurchase, and hair have been pulled and will go out in today's mail." (TR 1/8 at 22)(Tr. Exh. 6).

49. Cains provided Grassi with bank wiring information to deposit the purchase price of the Mare from Sh. Ammar to Stonewall. (SSOF).

50. On or about February 26, 2012, Grassi instructed Ajman Stud to wire $75,000.00 to Stonewall Farm. (SSOF)(Tr. Exhs. 7 & 8).

51. On February 28, 2012, Sh. Ammar's $74,968.00 check was received in

---

[7] Cerebellar Abiotrophy ["CA"] is a genetic neurological disorder in animals. It is known to affect the Arabian horse and is a recessive condition, meaning that both parents must carry and pass on the defective allele for an affected foal to be born. https://www.arabianhorses.org/export/content.export/aha-docs/Genetics_Cerebellar_Abiotrophy_Review.pdf

Stonewall Farm's account. (SSOF)(TR 1/16 at 18-19)(Tr. Exhs. 7 & 8).

52. On February 28, 2012, Cains emailed Grassi that his vet "called for a rush" on the CA test results and that he should have those results in a day or two. (Tr. Exh. 9).

53. On March 6, 2012, Cains e-mailed Grassi a copy of the Mare's CA test results and stated that she would be transported to Santa Ynez within 10 days. (Tr. Exhs. 10 & 11).

54. Grassi contacted Nancy Gallun informing her that the unbred Mare would arrive within 10 days. (TR 1/8 at 32; 1/9 at 9)(Tr. Exhs. 11 & 12).

55. The Mare was not delivered in 10 days and Cains informed Grassi that the transportation to California had been cancelled and it would be rescheduled. (TR 1/8 at 32-33).

56. The Mare stayed at Stonewall Farms from the date of sale until late May 2012 when she was delivered to Gallun Farms, which was late in the breeding season. (TR 1/10 at 14).

57. Stonewall Farms told Grassi that Ajman Stud would be charged $690 per month for boarding. (Tr. Exh. 212).

58. Nancy and Greg Gallun own Gallun Farms in Santa Ynez, California. (TR 1/10 at 5). The Galluns began breeding horses in 1996. (TR 1/9 at 5).

59. Nancy Gallun is a qualified expert on AHA rules and regulatory procedures, and the breeding of horses. (*Id.*)

60. Nancy Gallun has been involved in boarding, breeding and managing an embryo extraction program for over 18 years. (TR 1/9 at 5).

61. Nancy Gallun was in charge of Plaintiffs breeding program for Vervaldee. (TR 1/8 at 8).

62. Nancy Gallun described the breeding and embryo extraction process as placing a mares under lights to ensure that they are cycling correctly, managing a teasing schedule, and understanding the mare's ovulation schedule to ensure that they are bred at the

appropriate time.  (*Id.*)

63. Once an embryo(s) is extracted, they are placed in a recipient mare. (TR 1/9 at 5-6)

64. Generally, the best practice is that two embryos per month may be extracted from a mare.  (*Id.*)

65. It is well known in the horse breeding industry that once embryos reach 42-days they have a ninety-percent success rate of producing a foal.  (TR 1/15 at 106).

66. Gregory Gallun is employed by Sahara Scottsdale, which breeds and markets Arabian horses.  (*Id.* at 4).

67. Gregory Gallun has been in the Arabian horse business for over thirty-five years, training, conditioning and exhibiting Arabian horses in the United States and Europe. (*Id.* at 4-5)

68. Gregory Gallun has acted as an agent for sheiks of royal families and others in the Middle East, for the buying and selling of Arabian horses.  (1/10 at 6).

69. Gregory Gallun is a qualified expert in the customs and practices of the Arabian horse industry, including the practices and preferences of Middle Eastern buyers of Arabian horses, and Arabian horse valuation.  (*Id.* at 11).

70. Gregory Gallun has been a licensed judge for Arabian horse shows in the United States, Canada and Europe.  (*Id.* at 7)

71. Gregory Gallun has been qualified as an expert by a federal bankruptcy court in valuing Arabian horses in bankruptcy proceedings. (*Id.* at 7-8).

72. There is a high value in the European market placed on Arabian horse breeder designation and on the pedigree of each horse.  (*Id.*)

73. The offspring of two Versace horses such as the Mare and Vervaldee would be more marketable in Europe and the Middle East than in the United States. (*Id.*)

74. In every Arabian horse show, the breeder and the owner of the winning horse are recognized.  (*Id.* at 24)

75. The breeder is often included in the award ceremony and photographed with the owner and winning horse.  (*Id.* at 29)

76. The European Arabian horse community generally avoids purchasing Arabian horses with reserved embryo rights as it diminishes the prestige of exclusivity in ownership.  (*Id.*)

77. Reserved embryo rights incumber the European Arabian horse owner by requiring them to preserve and ship embryos and/or the recipient mare internationally which costs thousands of dollars. (*Id.* at 26)

78. Exclusivity of ownership and breeding of prestigious Arabian horse bloodlines results in money and prestige value to the owner and its breeding program.  (*Id*. at 24-26, 30).

**The Mare's foals with Vervaldee**

79. After arriving at Gallun Farms, the Mare[8] was bred with Vervaldee in July 2012. (*Id.* at 14)

80. Two recipient mares were shipped to Germany from Gallun Farms.  (TR 1/15 at 100).

81. The two mares produced two foals, A.J. Barari and La Bella Vervaldee.  (TR 1/10 at 14).

82. In total, seven foals were bred from the Mare.  (TR 1/15 at 101).

83. A.J. Barari was a very high-quality horse who won three gold medals and other titles in the Middle East and Europe and is worth an estimated $350,000.00 to $500,000.00. (TR 1/10 at 14,18 & 1/15 at 102-103.)

84. A.J. Bella Vervaldee is the second foal produced from the Mare and Vervaldee in 2013.  She is deemed a quality filly, primarily used in Ajman's breeding program, and is worth approximately $100,000.00.  (TR 1/10 at 20 & TR 1/15 at 104).

---

[8] A total of five foals were produced from the Mare after she left Stonewall Farms.  (TR 1/10 at 38)

85. Any foal bred by the Mare and Vervaldee would be considered a fairly high-quality offspring valued in the $100,000.00 range. (TR 1/10 at 20).

86. Offspring of the Mare and Vervaldee would be more highly refined than offspring between the Mare and Aria Impressario and would therefore have different marketability value. (*Id*. at 22)

**The Mare's breeding and offspring RD Versaria**

87. In June 2013, Grassi read that a foal, RD Versaria, born to a "La Bella Versace" within a few days of birth sold for $100,000.00. (TR 1/8 at 37).

88. The news of the birth, and its sale price, was rare and therefore noteworthy within the Arabian horse community. (TR 1/10 at 21).

89. Gallun was shocked as under her management, the Mare could not have a foal that was registered. (TR 1/9 at 7-8, 12).

90. Grassi, who did not have access to AHA documents, asked Nancy Gallun to investigate the foal because Cains told her the Mare was unbred and without a reservation of embryo rights. (TR 1/8 at 37-38; 1/9 at 7-8 & 1/10 at 25).

91. Nancy Gallun, found through AHA data sources that the Mare produced a filly on February 5, 2013 named RD Versaria. (TR 1/9 at 9-10, 30)(Tr.Exh. 27).

92. Gallun contacted RD Versaria's owner Shirley Popplewell who told her they purchased the foal bred from La Vella Versace and Aria Impresario. (*Id*. at 9-10)

93. Gallun contacted Jeff Sloan ("Sloan"), Aria Impresario's owner who confirmed that he provided the stallion services and Koch provided the Mare, La Bella Versace. (*Id*. at 10)

94. Sloan and Koch entered into a partnership to sell RD Versaria to the Popplewells for $100,000.00 and a reserved embryo right for Koch. (Tr. Exh. 21).

95. The AHA data source lists Stonewall Farms as the breeder for RD Versaria. (TR 1/9 at 62)(Tr. Exh. 105).

96. When Defendant Cains was confronted by Grassi and Sponle about Nancy

Galluns' findings regarding RD Versaria, he claimed that he really did not know about it but that it is possible that he was obligated to give the prior owner an embryo. (TR 1/10 at 47-48).

97. Defendants claimed that Plaintiffs' agent Grassi gave them two reserved embryo rights to the Mare, one for themselves and one for Koch, but could not produce evidence supporting that statement. (TR 1/10 at 86-88).

98. Defendant Cains stated that he owned the Mare until the embryo right obligations were fulfilled. (*Id*. at 55)

99. Cains also stated that he believed Stonewall Farms owned the Mare up through March 7. (*Id*. at 98)(Tr. Exh. 143 at 2)

**Taking the Mare's Embryos**

100. Stonewall Farms employed G.R. Longworth as a veterinarian contractor. (TR 1/16 at 86).

101. Cains testified that none of his veterinarians, including Dr. Longworth, require paperwork on horses from Stonewall Farms. (*Id*.)

102. Gallun's investigation showed that in February 2012 through March 2012, Cains directed Dr. Longworth to artificially inseminate the Mare resulting in the extraction of two embryos. (TR 1/10 at 22 & 56)(Tr. Exh. 19).

103. Defendants owned stallion Selket Marque. (Tr. Exh. 108).

104. The Mare was artificially inseminated with Selket Marque's sperm on February 26, 27, and 28 with an embryo flush on March 6, 2012. (SSOF)(TR 1/9 at 26, 28)(Tr. Exh. 18).

105. The embryo did not produce a foal. (TR 1/9 at 26; 1/10 at 81).

106. On March 16 and 17, 2012, Defendant Cains directed Dr. Longworth to artificially inseminate the Mare with Aria Impresario's sperm and he was present during the procedure. (SSOF)(TR 1/10 at 56-57)(Tr. Exhs. 19 & 93).

107. Aria Impresario was known at that time as the most credentialed stallion in the

United States. (TR 1/9 at 20).

108. On March 25, 2012, a second embryo was flushed from the Mare. (*Id*. 19-23) That breeding produced RD Versaria. (TR 1/10 at 86)(Tr. Exhs. 19 & 24).

109. Nancy Gallun considered the Mare's breeding history at Stonewall Farms excessive and brutal because she was less than two-years old and subjected to daily drugging and palpating ("requiring an entire human arm in her repro tract") which could have resulted in rupture. (TR 1/9 at 23-25 & 30)(Tr. Exhs. 18 7 19).

**The Foal RD Versaria**

110. Murray Popplewell saw a video of RD Versaria at three or four days of age. (TR 1/15 at 5).

111. Popplewell knew that RD Versaria was the Mare's offspring with Aria Impresario. (*Id*.)

112. On February 13, 2013, upon seeing RD Versaria, Popplewell entered into a purchase contract with Koch and Jeff Sloan for the seven-day-old foal. (*Id*.)(Tr. Exh. 21).

113. Popplewell purchased RD Versaria for $100,000.00 and a reserved embryo right. (*Id*.)

114. Popplewell registered RD Versaria with the AHA in June 2013. (*Id*. at 8-9)(Tr. Exh. 107).

115. The Popplewell's have shown the horse but they primarily use RD Versaria for breeding. (TR 1/15 at 12).

116. At time of trial, Murray Popplewell placed RD Versaria's value from between $200,000.00 to $400,000.00 or whatever someone was willing to pay. (TR 1/10 at 27; 1/15 at 16)

**AHA Registration and Certification Procedures**

117. When a mare has a reserved embryo, the custom is that the owner or the owner's agent arranges the breeding to satisfy the reservation. (*Id*. at 29)

118. To transfer an embryo/oocyte, the AHA requires that the donor mares obtain

an embryo/oocyte transfer permit. (TR 1/10 at 34)(Tr. Exh. 90).

119. The permit may only be obtained by the mare's owner and it is valid through the life of the mare or through ownership. (*Id*. at 34-35)

120. Once ownership of the mare terminates the permit is void. (*Id*.)

121. An embryo resulting in a foal requires the foal to have a certificate which can only be issued by the embryo/oocyte permit holder. (*Id*.)

122. To sell or transfer an embryo, the AHA requires an embryo transfer certificate. (*Id*.)

**Defendants Attempt to Transfer of Ownership of the Mare**

123. On March 9, 2012, Cains wrote a check to the AHA to process the transfer of the Mare's ownership from Koch to Stonewall Farms. (TR 1/10 at 45-46) (Tr. Exh 94).

124. Stonewall Farms claimed to have purchased the Mare on February 1, 2012 (TR 1/10 at 98) or February 15, 2012 from Laura Koch. (Tr. Exh. 143).

125. The date of the processing request is March 10 and the transfer of ownership date is February 1, 2012. (*Id*.)

126. On May 24, 2012, Defendants requested through the AHA that the Mare's ownership be transferred from Stonewall Farms to Plaintiffs. (TR 1/10 at 95)(Tr.Exh. 97).

127. Defendants note the transfer of ownership date as May 16, 2012. (*Id*.)

128. On June 6, Cains emailed AHA and requested that a hold be placed on his requested transfer of ownership to Ajman Stud. (*Id*.)(TR 1/9 at 55-57) (Tr. Exh. 97).

129. The AHA records show that the ownership transfer was not completed until December 2012. (*Id*.)

130. On June 11, 2012 Cains applied, as the Mare's owner, for an AHA embryo transfer permit. In the application, Cains claimed that Stonewall Farms owned the Mare when she was bred in March 2012. (TR 1/10 at 50-52)(Tr. Exh. 95).

131. The AHA Purebred Horse Display lists Ajman Stud as owner of the Mare as of May 16, 2012; Stonewall Farms as her prior owner as of February 1, 2012 and Laura

Koch as her prior owner as of November 30, 2010. (Tr. Exh. 91).

**Defendants' Prior Arabian Horse Transactions**

132. Joel Desmarteau, ("Desmarteau") wished to show his colt Marajj, and once done, Cains agreed to promote and market Marajj for sale. (UTR 1/10 *Desmarteau*)[9].

133. Cains admitted that Marajj was his client's horse at the same time he was working for Brookville Arabians, which was owned by David and Annabella Gelbard. (TR 1/10 at 115).

134. Cains was also working as the "agent or manager" of Brookville Arabian, where Marajj was being trained. (*Id.*)

135. Prior to Desmarteau being able to show Marajj, Cains convinced him that Marajj was flawed and would not show well. (UTR 1/10).

136. Cains brought Desmarteau an offer from the Gelbards of $50,000.00 for Marajj suggesting that the price was excellent owing to what Cains considered as the horse's subpar condition. Desmarteau refused the offer. (*Id.*)

137. As a result of Cains' repeated representations about Marajj's condition, Desmarteau agreed to sell Marajj to Brookville for $60,000.00, and three reserved breedings per year for the life of the horse, even if resold. (Tr. Exh. 39-A).

138. The reserved breeding rights of Desmarteau in Marajj were to be disclosed and set forth in any subsequent sale. (UTR 1/10)(TR. Exh. 39-A).

139. Days after the Marajj was sold to Brookville, Defendants purchased a 50% interest in Marajj from Brookville, for $30,000.00 which Bailey funded.

140. Approximately one month later, Brookville and Defendants sold Marajj to Sh. Mohammed for $420,000.00 of which Defendants received a 50% share. (*Id*. at 113, 117).

141. Cains prepared two sales contracts, one, signed by Annabella Gelbard, preserving Desmarteau's reserved breeding rights and a second version, signed two days

---

[9] "UTR" designates an uncertified transcript.

later by David Gelbard, which did not include Desmarteau's reserved breeding rights. (TR 1/16 at 116-117)(Tr. Exh. 39 at 21-23).

142. Desmarteau learned of the sale to Sh. Mohammed at a horse show where Marajj won world champion in Paris, prompting him to enforce his retained embryo. (UTR 1/10)

143. Sh. Mohammed refused Desmarteau's reserved rights prompting him to sue Cains, Brookville, and the Gelbards for failure to preserve those rights. (*Id.*)(Tr. Exh. 39).

144. The Gelbards and Brookville filed cross-claims against Cains, claiming that he deceived them into signing the second contract, which left out Desmarteau's reserved breeding rights. (Tr. Exh. 39).

145. Desmarteau and Cains entered a settlement agreement and the Gelbards obtained a $350,000 jury verdict and judgment against Cains. (Tr. Exh. 38).

146. Bailey and his companies provided the goods and/or services to satisfy the Desmarteau settlement and a settlement of the Gelbard judgment. (TR 1/10 at 118).

147. In 2012 Stonewall Farms was sued by Catherine Linderman arising out of the sale of three mares she jointly owned with Vona Huggins. (TR 1/15 at 33-44).

148. Unknown to Linderman, Huggins and Stonewall Farms entered into an agreement on May 1, 2012, wherein Huggins transferred ownership of the mares from herself, jointly to Stonewall Farms, in exchange for the expense of boarding and caring for them for life. Cains, on behalf of Stonewall Farms prepared a partnership agreement with Huggins. (*Id.*) (Tr. Exh. 67).

149. Cains attempted to transfer the mares solely to himself, to help Huggins shield them from her spouse, but was denied by the AHA. (*Id*. at 40)

150. Cains and Huggins sold embryos from the mares, including a sale to Ajman Stud, in April, prior to the May 1, 2012 ownership agreement. (*Id*. at 41-42)

151. Linderman sued Stonewall Farms and Cains claiming that she was not aware of the ownership transfer, nor did she receive profits from the embryo sales, and Stonewall Farms settled her claims with one horse and frozen semen. (*Id*. at 44).

152. In 2013, Toni Pierce of Quintessa Arabians claimed that Cains traded her two horses, Mystery E and Shafe Psykay, for a filly bred by Pierce. (TR 1/15 at 79-81)(Tr. Exh. 137).

153. In 2015, Pierce learned that Mystery E was not owned by Stonewall Farms when Cains made the trade and she still had not been paid fully for. As a result, Pierce could not register Mystery E or its foal with the AHA (*Id.*)

154. Bailey issued a promissory note to Pierce to resolve the dispute. (Tr. Exh. 139).

### A. Credibility of Parties and Witnesses

Sh. Ammar was deposed but he did not appear at the trial. The Court, however has reviewed his deposition testimony. The Court finds Elise Grassi, Nancy Gallun, Frank Sponle, and Greg Gallun credible. They each independently corroborated important material facts. The Court finds Bailey less than credible. As the founder of Stonewall Farms, he was vague about Stonewall Farms' work, its operations, management, and finances.

Cains is not credible. During direct and cross examination, Cains had little or no recollection of pertinent facts; could not testify about his income from Stonewall Farms, he did not produce business or finance records, or claimed to have lost them, and he had failed memories on significant issues relating to the negotiation, sale and purchase of Arabian horses worth thousands of dollars. More troubling is that in the face of controverting evidence, Cains denied engaging in email communications with Grassi. *See* (TR 1/10 at 63-68). Compounding this is a pattern of producing back-dated contracts, back dating permit application forms, and asking the AHA to hold off processing AHA registration documents. While Cains described the Arabian horse trade business practice as conducted "on a smile and handshake," the record shows that he engaged in a pattern of recklessness, deceit and fraud. In making these findings, the Court has considered the prior act evidence that show a pattern of Stonewall Farms, and Cains's unscrupulous business transactions in the buying and selling of Arabian horses and embryo rights. Accordingly,

the Court gives little weight to Cains' testimony.

## II. PENDING MOTIONS

Approximately two-and-a-half weeks before trial, Defendants filed a Motion to Dismiss Counts Due to Discovery Abuses During Sh. Ammar's Deposition[10] (Doc. 97). Plaintiffs' filed a Response (Doc. 104). Defendants argue that in his deposition, Sh. Ammar was being fed answers by his agent, Elise Grassi, and that such conduct was sanctioned by Plaintiffs' counsel. The Court permitted Defendants to cross-examine Grassi in support of their Motion. (TR 1/8 at 141-43). Grassi denied feeding Sh. Ammar answers and stated she did not see Plaintiffs' counsel do so. (*Id.* at 143). The Court finds Grassi credible and Defendants' Motion meritless. Notably, Sh. Ammar's deposition was taken on October 15, 2015. (Doc. 17). Defendants' relied on his testimony in their Summary Judgment Motion and/or Dismissal of Plaintiffs' Claims Due to Disclosure and Discovery Abuses (Doc. 49) which the Court denied (Doc. 67). The Court likewise denies Defendants' Motion as it is both untimely and without merit.[11]

## III. CONCLUSIONS OF LAW

### A. Alter Ego – Stonewall Farms and Bailey

Plaintiffs' Complaint alleges that Cains and Bailey were "at all times responsible managing, agents, controlling persons, partners, directors, officers, managers, [and] shareholders[,]" of Stonewall Farms and were at all times alter egos of each other having comingled interests and assets. (Co. at 27). Defendants argue that Bailey was not involved in any transaction related to the Mare and thus he is not liable.

#### 1. Legal Standard

"The corporate fiction will be disregarded when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice." *Dietel v. Day*, 492 P.2d 455, 457 (1972). The alter ego status exists when there is "such unity of interest and ownership that the separate personalities of the corporation

---

[10] Defendants also filed a Motion Requesting Leave to File DVD [of Sh. Ammar's deposition] as an Exhibit. (Doc. 98). The Court denies the Motion.
[11] In fact, neither party introduced Sh. Ammar's testimony at trial.

and owners cease to exist. *Id.* (*citing Employers Liability Assurances Corporation v. Lunt*, 313 P.2d 393 (1957)). However, where there is no substantial evidence of intermingling of corporate and personal assets, affairs or funds, there is no basis on which to find the existence of an alter ego. *Id.* (*citing Ferrarell v. Robinson*, 465 P.2d 610 (1970)).

### 2. Analysis

Substantial evidence shows that Bailey and Cains had a unity of interests in Stonewall Farms making them indistinguishable from the corporation. First, Stonewall Farms was formed with the combined assets of Bailey and Cains. (TR 1/16 at 10-11). Bailey and Cains were in a long-time relationship and they lived together in a home owned by Bailey on the five-acre Stonewall Farms horse property. (TR 1/10 at 54; 1/15 at 166). Bailey used the Stonewall Farms property for his media businesses and to show, train, buy, and breed horses. (TR 1/16 at 22 and 46). Bailey acknowledged Stonewall Farms, not his other businesses, primarily paid fees for repair, maintenance, improvements, and landscaping of the entire property. (*Id* at 46-47).

Second, since its incorporation, Stonewall Farms changed management between Bailey and Cains at least three times. At time of trial, it was owned by Bailey and Cains was its manager. (SSOF). Nonetheless, although the corporation was routinely transferred between the two, Bailey testified that he assumed that Stonewall Farms "was always in my name." (TR 1/16 at 11). Regarding use of the corporate funds, Cains stated that though he did not know if assets were ever transferred from Stonewall Farms to Bailey, Bailey likely paid his legal fees through Stonewall Farms. (*Id.* at 18) Bailey also purchased and titled equipment used to run Stonewall Farms because Stonewall Farms never established its own credit. (*Id.* at 50 -51). Bailey also signed all of Stonewall Farms' tax returns. (*Id.* at 11). For his part, Cains could not recall who was in charge of Stonewall Farms' books and records for the relevant time period. (*Id.* at 69)

As for Bailey's involvement in Stonewall Farms horse dealings, the trial testimony revealed that regardless of who was corporate manager or owner, the horse breeding, buying and selling decisions were mutually made by Bailey and Cains (*Id.* at 123-124).

Moreover, as of June 2009 the AHA lists both Bailey and Cains as "Owner Authos" indicating that they are both authorized to sign for Stonewall Farms. (Tr. Exh. 92). Bailey also assumed prior settlement costs for Stonewall Farms and Cains. (TR 1/10 at 118)(Te. Exh. 139). The Court finds that Stonewall Farms is the alter ego of both Defendants Bailey and Cains.

Because the Court finds that Stonewall Farms is the alter ego of Bailey and Cains, the Court need not find that Bailey was specifically involved in selling the Mare. It is sufficient that Bailey testified about his long history of horse transactions with or for Plaintiffs as corroborated by Cains email to Sh. Ammar: "Scott and I have nothing but the up-most [sic] respect for you *as a client* and as a friend." (Tr. Exh. 23)(Emphasis added). Finally, Bailey testified "[t]he cheapest horse he purchased from us was La Bella Versace" thus verifying the alter ego nature of his corporation and his involvement in selling the Mare. (TR 1/18 at 6I). Therefore, Bailey is mutually liable for Stonewall Farms acts.

**B.** **Plaintiffs' Breach of Contract Claim**

**1.** **Legal Standard**

To succeed on a breach of contract claim, a party must prove the existence of a contract between the parties, a breach of contract terms and resulting damages. *See Coleman v. Watts*, 87 F. Supp. 2d 944, 955 (D. Ariz. 1998) (*citing Clark v. Compania Ganadera de Cananea*, S.A., 387 P.2d 235, 237 (1963). "For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms" to ensure the parties understand their obligations thereunder. *Contempo Const. Co. v. Mountain States Tel. & Tel.Co*., 736 P.2d 13, 15 (Ariz. Ct. App. 1987).

**2.** **Analysis**

The parties agree that they entered into a contract for the sale and purchase of the Mare. They each produced a signed contract and dispute which of the two contracts controls.

**i.** **Competing contracts**

Plaintiffs argue that on February 25, 2012, after personally speaking about the Mare,

her condition and purchase price, Grassi drafted a purchase contract. The contract dated February 25, 2012 was signed only by Sh. Ammar and emailed to Defendants on that day. (Tr. Exhs. 4, 5 & 200). Plaintiffs claim the controlling contract is the following:

**SALES AGREEMENT**

This Sales Agreement is made and entered into this 25th day of February, 2012, by and between Sh. Ammar Bin Humaid Al Nuaimi, hereinafter referred to as "Buyer", and Stonewall Farm, hereinafter referred to as "Seller".

RECITALS

    A. Whereas seller owns the horse known as **LA BELLA VERSACE**, 2010 chestnut mare. Sire: Versace – Dam: SA Shareyd

    B. Whereas Buyer wishes to purchase and Seller wishes to sell such horse

Now therefore, in consideration of the mutual covenants and promises contained herein, the parties hereby agree as follow:

    1. **ADOPTION OF RECITALS**: The recitals listed above hereby are incorporated into this agreement as if set forth in full herein.

    2. **PURCHASE PRICE**: Seller hereby agrees to sell and Buyer hereby agrees to buy the above described horse for the total puchase price of 75.000,- USD (Seventy Five Thousand Dollars and no/00).

    3. **PAYMENT TERMS**: Full payment is due at signing of this contract

    4. **INSURANCE**: Insurance is optional and is to be paid for by the Buyer. All risks and responsibilities will pass onto Buyer upon signing of this contract.

    5. **DISCLAMER OF WARRANTIES**: The Buyer has had the opportunity to view and inspect the horse, and the Buyer understands and agrees that they are buying the horse in AS IS condition. All warranties expressed or implied, including implied warranties of merchantability and fitness for a particular purpose, hereby are disclaimed. <u>The horse is tested SCID clear.</u>

    6. **AHA REGISTRATION**: Seller shall deliver registration papers to the Buyer, properly endorsed to effect the transfer of ownership, as soon as full payment has been received.

    7. **PENDING**: This contract is pending a <u>CLEAR CA</u> test result and <u>pre purchase vet exam</u>. This contract will be invalid if the CA test result or vet exam will return positive.

By:_____
Sh. Ammar bin Humaid Al Nuaimi
*(buyer)*

By:_____
Stonewall Farm – David Cains
*(seller)*

**AS_000001**

Cains claimed that in February 2012, he prepared and sent Grassi a written contract. (TR 1/10 at 61)(Tr. Exh. 17). The contract is also dated February 25, 2012 and signed only by Cains on February 28, 2012. Grassi testified that she never received that contract. (TR 1/8 at 61). Cains did not produce evidence that he emailed or otherwise delivered the contract to Grassi or Sh. Ammar. The numerous and obvious errors in Defendants' contract render it void. For example, Defendants' contract is titled "Installment and Security Contract." Grassi testified that an installment term was unnecessary because payment was expected in full. (TR 1/8 at 62-63). It lists the Mare's Seller as Ajman Stud and the Buyer as Stonewall Farms. The undisputed facts are Ajman Stud was the buyer, not the seller. The agreement is contingent upon a clear SCID test while simultaneously declaring the Mare SCID *and* CA clear. Yet, Defendants advertised the Mare as SCID clear but *not* CA clear. Cains also testified that an attorney drafted various contract terms for Stonewall Farms and "this is just a copy and paste" of terms that he was told to include. (TR 1/10 at 75). In addition, the contract had three signature pages signed by Cains and were respectively dated February 28, 2012, March 20, 2012, and March 25, 2012. (Tr. Exh. 17). Cains explained that he may have printed the contract, wrote an incorrect date and printed the signature page again, and still got the wrong date. (TR 1/10 at 100). Importantly, Cains was unable to produce any evidence of delivering his contract to Grassi which belie his claims.

### ii. Analysis - Breach of the Plaintiffs' Contract Terms

Plaintiffs allege that Defendants breached the contract in two ways: "(a) Defendants agreed, promised and warranted that they were transferring or causing to be transferred to Plaintiff's assignor <u>all</u> of the rights, title and interests in the Mare free of any encumbrance, claim or reservation, including any putative reserved embryo right, when in fact, Defendants intended to extract and did extract at least two embryos from the Mare before transferring possession of the Mare[;] and (b) Defendants failed to transfer to Plaintiff's Assignor any bona fide rights of Laura Koch to an embryo from the Mare." (Co. at 34).

Neither party focused on the written contract terms, nor did they argue that the

contract terms were ambiguous. The contract expressly states that the parties agree based on "consideration of the mutual covenants and promises contained" in the contract. (Tr. Exh. 4). The covenants and promises include the following: Recital (2) sets the purchase price at $75,000.00; Recital (3) states payment is due on signing of the contract; Recital (6) provides that Seller shall deliver registration papers to Buyer properly endorsed to effect the transfer of ownership as soon as full payment has been received and Recital (7) states the contract is pending a "Clear CA test result and pre purchase vet exam" and provides the contract is void if the CA result is positive. (*Id.*)

Both parties acted to fulfill Plaintiffs' contract terms. Plaintiffs paid the agreed price, Defendants received that payment and on March 6, 2012 emailed Grassi the CA clear examination report which she received on March 7.[12] Although Defendants did not transfer ownership upon receiving final payment, Recital (7) renders that provision superfluous. Contrary to Plaintiffs Complaint, no contract term specifies that Defendants shall transfer "all of the rights, title and interests in the Mare *free of any encumbrances*, *claim or reservation*[.]" (*Id.* at 34)(emphasis added). Plaintiffs' contract is also silent on "putative reserved embryo rights."[13] (*Id.*). Thus, the Court infers that no meeting of the minds occurred regarding existing encumbrances. Thus, the parties fulfilled the contract terms and ownership of the Mare passed to Plaintiffs at the earliest on March 6 and at the latest on March 7, 2012. Plaintiffs' Breach of Contract Claim fails.

**C.** **Second Claim - Breach of the Covenant of Good Faith & Fair Dealing**

**1.** **Legal Standard**

---

[12] Grassi was conducting the transaction from her home in Germany which resulted in a time delay.

[13] Grassi testified that prior to signing the contract, Cains verbally avowed that the Mare was unbred and without a reservation of embryo rights. (TR 1/8/ at 16 - 17). The Court has considered this testimony but cannot find the contract language "reasonably susceptible" or in conformance with Grassi's testimony because it is silent on those two matters. *See Taylor v. State Farm Mutual Automobile Insurance Co.*, 175 Ariz. 148, 841 P.2d 1134, 1140 (1993)(discussing when the parole evidence rule is appropriate to interpret contract terms).

The duty of good faith and fair dealing is implied in every contract. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowners Ass'n*, 167 P.3d 1277, 1287 (Ariz. Ct. App. 2007) (citing *Wells Fargo Bank*, 38 P.3d at 29–30). Arizona courts follow the Restatement (Second) of Contracts § 205 (1981), which describes the duty of good faith and fair dealing in contract including: "[B]ad faith [which] may be overt or may consist of inaction, and fair dealing [which] may require more than honesty." Judicial decisions have also recognized evasion of the spirit of the bargain, lack of diligence, and abuse of a power to specify terms may also constitute good faith and fair dealing. *Airfreight Exp. Ltd. v. Evergreen Air Ctr., Inc.*, 158 P.3d 232, 241 (Ariz. Ct. App. 2007).

## 2. Analysis

Plaintiffs allege that Defendants offered the Mare for sale and executed the sales contract when they did not own her. They assert that Defendants bought the Mare from Koch after Sh. Ammar wired $75,000.00 to Stonewall Farms. Plaintiffs also assert that they induced the purchase by describing the Mare as being unbred and without a reservation of embryo rights. Plaintiffs argue that they would not have purchased the Mare if they had known she had encumbered embryo rights.

The contract refers to Stonewall Farms as the "Seller" and recital A specifies "Whereas seller owns the horse known as La Bella Versace[.]" Thus, Defendants held themselves out as the Mare's owner when they entered into the contract. Defendant Cains states that before selling the Mare to Plaintiffs, in early February, he purchased her from Koch through Jamie Heathcott. Plaintiffs argue that Defendants used Sh. Ammar's payment to purchase the Mare from Koch. There is no record evidence showing how or when payment was made. Cains testified that he paid Heathcott with a check which she

lost. He then wired another check to her personal account. (TR 1/15 at 29). At trial, neither Heathcott nor Cains could produce evidence of a cancelled check or a wire receipt. (*Id.* at 54). Nor could either recall the date of the purported purchase or exchange of payment. However, Defendants avowed that they purchased the Mare on February 15, 2012. (Exh. 143).

The only record evidence of transferred ownership is the AHA form completed by Cains. (TR. Exh 94). The AHA form shows that on March 9, three days *after* Plaintiffs owned the Mare, Defendants wrote a check to the AHA transferring ownership of the Mare from Koch to Stonewall Farms. Cains stated that Koch asked him to prepare an "after the fact contract" for the sale. (TR 1/15 at 22-23). The contract is dated February 15, 2012, but signed and dated in May 2012. (Tr. Exh. 256). Cains could not recall when he prepared or signed the contract. (*Id.* at 23). Additionally, Cains sought a signed but undated transfer of ownership document from Koch's agents (Steve Heathcott and Jaime Bornstien). (*Id.* at 28)(Tr. Exh. 144).

It is plausible that Defendants owned the Mare at some point. However, their inability to produce purchase agreements or payment records make it difficult to determine when they did so. Defendants acts of registering her on March 9 with the AHA, drafting an after-the-fact contract signed in May, and seeking undated ownership documents support Plaintiffs' claim that Defendants did not own the Mare when they sold her. Thus, the Court finds Defendants breached the covenant of good faith and fair dealing by falsely stating in the executed contract that they owned the Mare and by withholding information from Plaintiffs about Koch. Had Defendants done so, Plaintiffs could have investigated whether she was encumbered by a prior owner's reserved rights.

Plaintiffs next assert that Defendants breached the covenant of good faith and fair dealing by describing the Mare as unbred and without encumbered embryos. Grassi and Sponle testified consistently that Defendants claimed the Mare was unbred and without reserved embryo rights. (TR 1/8 at 16). Nancy Gallun also testified that when Grassi told her about the Mare, she described her as not having been bred. (TR 1/9 at 7-8). The absence

of encumbrances and breeding increased the Mare's value to Plaintiffs breeding program with Vervaldee. Plaintiffs were interested in exclusively breeding Vervaldee with a Versace Mare for the heightened monetary and prestige value to be realized from their resulting foals. (TR 1/8 at 16-17). Indeed, Grassi's reaction to hearing that the Mare had produced R.D. Versaria supports this. Upon seeing the birth announcement, she immediately contacted Nancy Gallun to investigate how the unbred Mare could have birthed a foal given that Plaintiffs owned her and controlled her breeding program.

The Court finds that Defendants breached the covenant of good faith and fair dealing by omitting material facts to induce Plaintiffs into purchasing the Mare. Defendants' omissions effectively denied Plaintiffs the intended benefits that flow from their contractual agreement, that is, exclusivity in the Mare's ownership, breeding and her planned offspring with Vervaldee. *See Wells Fargo Bank*, 38 P.3d at 29–30. Plaintiffs prevail on Count Two of their Complaint.

### D. Third Claim - Fraud and Deceit

Plaintiffs allege that during their negotiations, Defendants made false representations about the Mare, and their ownership of her at the time they offered her for sale and through the completion of the contract. Defendants assert they made no claims about the Mare upon which the Plaintiffs relied. (Doc. 129 at 29).

#### 1. Legal Standard

To prove fraud, Plaintiffs must establish: "(1) [a] representation; (2) its falsity; (3) its materiality; (4) Defendants knowledge of its falsity or ignorance of its truth; (5) [their] intent that it should be acted upon by [Plaintiff] and in the manner reasonably contemplated; (6) [Plaintiffs] ignorance of its falsity; (7) [Plaintiffs] reliance on its truth; (8) [Plaintiffs] right to rely thereon; and (9) [their ] consequent and proximate injury." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 333, ¶ 31 (Ariz. Ct. App. 2014) (quoting *Nielson v. Flashberg*, 101 Ariz. 335, 338-39 (1966). Fraud must be established by clear and convincing evidence. *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 77, ¶ 18 (Ariz. Ct. App. 1998). Thus, "[w]here a seller knows of facts materially

affecting the value of property and knows that the facts are not known to the buyer, the seller has a legal duty to disclose such facts." *Lombardo v. Albu*, 14 P.3d 288, 290 (Ariz. 2000), *see also Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 21 (2002) ("Unlike simple nondisclosure, a party may be liable for acts taken to conceal, mislead or otherwise deceive, even in the absence of a fiduciary, statutory, or other legal duty to disclose.").

### 2. Analysis

Defendants represented through acts and omissions that they owned the Mare. (Tr. Exh. 4). As previously found, Defendants were unable to refute the credible testimony and evidence that they did not. Indeed, the pattern and practice of Defendants' misrepresenting their ownership of horses when offered for sale supports this finding. (TR 1/15 at 33-44) (Tr. Exh. 137).

Defendants also told Grassi that she was without reserved embryo right. Contrary to that statement, Defendants rushed to complete a purchase from Koch so they could extract an embryo for themselves and Koch before delivering the Mare to Plaintiffs. Defendants, contention that they told Grassi that the Mare had reserved embryos is contrary to their behavior. Tellingly, the Defendants were extracting embryos from the Mare on the very day they told Grassi she would be delivered to Gallun Farms. Moreover, Defendants never told Plaintiffs that Koch's embryo extraction was fulfilled, or that their embryo right had not been fulfilled, which would support their narrative.

Second, Defendants claimed that the Mare would not be bred prior to being delivered to Plaintiffs. (TR 1/8 at 16). The record shows that Plaintiffs purchased the young Versace Mare to breed her with Vervaldee. Plaintiffs believed that her unbred status would increase the value of offspring with Vervaldee. Both Grassi's and Nancy Gallun's reaction to the news of RD Versaria supports that Plaintiffs believed that Defendants representations were true. The material misrepresentations were used to sell the Mare. Indeed, Grassi's inquiry to Cains about the Mare's status prior to the purchase reinforced Plaintiffs belief that she was well suited for Vervaldee's exclusive breeding program. The

record shows overwhelming evidence, that Defendants' representations were material to the purchase agreement. Accordingly, Plaintiffs succeed on their Count Three fraud claim.

### E.    Fourth Claim - Conversion of the Property Rights Plaintiffs

Plaintiffs claim that while the Mare was at Stonewall Farms, Defendants damaged her by subjecting her to multiple inseminations and embryo extractions resulting in property conversion. Defendants respond that Stonewall was obligated to flush an embryo from the Mare for Koch, and that these acts were not hidden from Plaintiff. (Doc. 129 at 31). Defendants also argue, for the first time, that Plaintiffs' conversion claim falls outside of the two-year statute of limitations. (*Id*. at 30)

#### 1.    Legal Standard

Conversion is "an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another." *Case Corp. v. Gehrke,* 208 Ariz. 140, 143, ¶ 11 (Ariz. Ct. App. 2004) (citation omitted), *see also Focal Point, Inc. v. U-Haul Co*., 746 P.2d 488, 489 (Ariz. Ct. App.1986) (conversion is "[a]n intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.") (quoting Restatement (Second) of Torts § 222(A)(1)(1965)). Arizona Revised Statute section 12-542 provides that a cause of action for conversion shall commence two years after the action accrues. Under Arizona law, a conversion claim accrues "at the time of the wrongful taking and not at the time of the discovery by plaintiff of the taking or of the identity of the taker." *Jackson v. Am. Credit Bureau, Inc*., 531 P.2d 932, 934 (Ariz. Ct. App.1975).

##### i.    Statute of limitations - Waiver

Defendants did not raise the statute of limitations bar as an affirmative defense or in their dispositive motion. Defendants now argue that Plaintiffs' conversion claim fails because they knew or should have known by "February or early March 2013" that an embryo was extracted from the Mare before she arrived at Gallun Farms. (Doc. 129 at 30). Thus, Defendants' assert that the statute of limitations expired by the time Plaintiffs filed

their claim on April 16, 2015.  Not only do Defendants misstate the law, they waived this argument.

Rule 8 requires a defendant to "state in short and plain terms its defenses to each claim asserted against it."  Fed.R.Civ.P. 8.  Rule 8 defines "statute of limitations" as an affirmative defense that must be raised when "responding to a pleading." (*Id.*).  A statutory time limitation defense is forfeited if not raised in a defendant's answer or in an amendment to the answer.  *Wood v. Milyard*, 132 S. Ct. 1826, 182 L. Ed. 2d 733 (2012).  An affirmative defense, once forfeited, is "exclu[ded] from the case," and cannot be asserted on appeal. *See Day v. McDonough*, 547 U.S. 198, 217 (2006).  Moreover, a statute of limitations defense is not jurisdictional, and therefore federal courts are not obligated to raise the time bar *sua sponte*. *Id.*  Defendants did not raise the statute of limitations in their Answer, nor in their summary judgment motion.  (Docs. 6 & 49).  They do so only in post-trial pleadings.  Defendants have waived this argument.

## 2.    Analysis

Conversion claims accrue at the time of the wrongful taking, not when Plaintiffs *discovered* the taking.  *Id.* at 199 (emphasis added).  The contract's terms were fulfilled on March 6, 2012 when Cains provided Plaintiffs with the CA test results. Sh. Ammar owned the Mare on that day.  Plaintiffs, however, did not take immediate possession of her. Rather, Stonewall Farms was to arrange for her transportation to Gallun Farms within 10 days of March 7 but failed to do so.

While at Stonewall Farms, Defendants directed Dr. Longworth to artificially inseminate the Mare on February 26, 2012.  (TR 1/15 at )(Exh. 18).  She was again inseminated on February 27 and 28 with an embryo flush on March 6.  The procedures occurred one day after Grassi emailed the signed purchase contract to Defendants and one day before Stonewall Farms received payment.  Defendants again told Dr. Longworth to artificially inseminate her on March 16 and 17 with an embryo flush on March 25.

Cains argued that Stonewall Farms owned the Mare until all breeding obligations were fulfilled. (TR  1/15 at 55).  In contradiction, he said that Plaintiffs owned the Mare

on March 7. (TR 1/15 at 89). Cains also testified that Grassi told him he could extract embryos from the Mare until she left the Country. Yet, he never told Plaintiffs, Grassi or Nancy Gallun that his extractions were unsuccessful and thus, his rights unfulfilled. (TR at 81- 83). Defendants contract obligated them to "effect the transfer of ownership" upon receiving the CA clear test, but they failed to do so. These facts show that Defendants delay was deliberately designed to enrich themselves by taking an embryo.

Defendants also continued to interfere with Plaintiffs' ownership rights when they acted to manipulate the AHA ownership registration process. First, on May 24, Defendants requested that the AHA transfer ownership of the Mare from Stonewall Farms to Ajman Stud with a transfer date of May 16, well beyond the March 6. (Tr. Exh. 97). On June 11, 2012, when applying for an embryo transfer permit Defendants wrote that Stonewall Farms owned the Mare when she was bred in March 2012. (TR 1/10 at 50-52 )(Tr. Exh. 95). Again, a factually incorrect statement. Defendants manipulation of the AHA registration process was intended to enable them to take credit for breeding RD Versaria.

The Court finds Defendants' claims are obviously fabricated. Thus, Defendants engaged in wrongful conversion of Plaintiffs property on March 6, 16, 17 and 25 by subjecting the Mare to repeated inseminations and embryo extractions. They did so without Plaintiffs' consent or knowledge. Plaintiffs had a right to receive her in the condition in which she was offered – unbred. Defendants' repeated use of the Mare deprived Plaintiffs of receiving her in the conditioned offered and ultimately devalued the contracts intended purpose. Therefore, Plaintiffs prevail on Count Four of their Complaint.

**F.    Fifth Claim - Breach of Fiduciary Duty**

Plaintiffs allege that Defendants "retained possession, custody and control of the Mare as the agent of Plaintiffs' Assignor and were acting as the constructive trustee or bailee for her owner" and they intentionally delayed delivering the Mare to breed her. (Co. at 39-41). Defendants admit that the Mare was bred to their stallion Selket Marque and to Aria Impressario, (Ans. at 7-8), but state their agreement with Plaintiffs was a routine commercial transaction not resulting in a fiduciary relationship. (Doc. 129 at 31).

1

2          **1.     Legal Standard**

3          To establish a fiduciary relationship there must be "something approximating

4  business agency, professional relationship, or family tie impelling or inducing the trusting

5  party to relax the care and vigilance he would ordinarily exercise." *Taeger v. Catholic*

6  *Family and Cmty. Servs.,* 995 P.2d 721, 726 (Ariz. Ct. App. 1999) (citations omitted).

7  Further, the relationship of the parties must bind one to act for the benefit of another.  *Id.*

8  at 290.  Commercial transactions do not generally create a fiduciary relationship unless one

9  party agrees to serve in a fiduciary capacity.  *Urias v. PCS Health Sys., Inc*., 118 P.3d 29,

10 35 (Ariz. Ct. App. 2005).

11         **2.     Analysis**.

12         Defendants Cain and Bailey testified that they had prior business dealings and

13 personal relationships with Sh. Ammar, Grassi and Sponle for many years.  (TR 1/19 at

14 79; 1/15 at 56, 66).  Indeed, Cains confirms that Defendants' relationship with Plaintiffs,

15 and its agent, Grassi, were "all very good friends" and that their acts were based upon trust

16 built over time. (TR 1/10 at 89)(Tr. Exh. 23).  Cains described this relationship as "[w]e

17 trusted each other, and we did things on a handshake and a smile[.]"  (*Id.*)  Cains also

18 testified that "Sheikh Ammar was our very good friend, and we respected him, and we

19 wanted to make him happy." (*Id.* at 92).  In an email dated February 22, 2014, Cains details

20 his and Bailey's business and personal interactions with Plaintiffs.  He confirms that Bailey

21 and Sh. Ammar have been acquainted for over 25 years, that they know and trust one

22 another, and that their personal interactions include Bailey picking up a watch in New York

23 for Sh. Ammar, Sh. Ammar gifting Bailey a Rolex for supporting Ajman Stud, and

24 Plaintiffs employing Bailey's web services.  Defendants indeed describe an intimate

25 relationship that would induce Plaintiffs to relax the care they would normally exercise in

26 conducting routine commercial transactions. *See Taeger*, 196 Ariz. at 290.  The Court has

27 no trouble finding that Defendants were bound by a fiduciary relationship with Plaintiffs.

28         Finding that Defendants were acting as fiduciaries, the Court also finds that they

breached their fiduciary duty when they failed to deliver the Mare as promised and when they had her repeatedly artificially inseminated and embryos extracted. Nancy Gallun testified that embryo extractions on a young foal of the Mare's age, could result in injury. (TR at 1/10 at 23-25). Defendants then submitted documents to the AHA purporting to be the owner of the Mare, including documents necessary by the AHA rules, to transfer the RD Versaria embryo to Koch. Whether by purposeful deceit or delay, willful ignorance or recklessness, Defendants conduct in submitting back dated and incorrect forms to the AHA, and seeking delayed registration of ownership, deprived Plaintiffs of their recognized ownership of the Mare's highly valued offspring with Aria Impressario. The Court finds that Defendants purposefully delayed the request to transfer ownership to Plaintiffs to serve their own interests. Plaintiffs prevail on Count Five of the Complaint.

### G. Sixth Claim - Breach of Duties of Bailment Relationship

#### 1. Legal Standard

To prevail on a breach of duties of bailment, Plaintiff must prove a delivery by the bailor and acceptance by the bailee of the subject matter of the bailment. The property must be placed in the bailee's actual or constructive possession. *Webb v. Aero Int'l. Inc.*, 633 P.2d 1044, 1045 (Ariz. Ct. App. 1981). The bailee's duty is one of reasonable care to protect the bailed property from loss, damage, or destruction. *See Alitalia v. Arrow Trucking Co.*, 977 F.Supp. 973, 980 (D. Ariz. 1997).

#### 2. Analysis

Plaintiffs allege that they entrusted Defendants to act as a bailee for the Mare and that Defendants did assume that role. (Co. at 42). Defendants argue that because Plaintiffs did not act to possess the Mare or to secure her title, they are not liable.[14]

The Court finds that Defendants were acting as bailees when they agreed to board and transport the Mare. Defendants told Grassi that she would be shipped in ten days, yet they failed to do so. Rather, Defendants intentionally delayed delivering the Mare to Gallun

---

[14] In addition, Defendants citing *Buchanan v. Green*, 73 Ariz. 159, 238 P.2d 1107, 1108 (1951) argue that even if Defendants are found to be bailees, it does not give rise to a separate cause of action. (Doc. 129 at 32). The cited case does not so hold.

Farms to have her artificially inseminated for themselves and Koch. The inseminations were on March 16 and 17, the very time she was to be shipped, indicating Defendants never intended to deliver her as stated. Moreover, Cains told Grassi that their monthly costs for boarding the Mare was $690.00 evincing that they assumed a caretaker role. (Tr. Exh. 212). It makes no difference whether they collected that fee. Defendants, as bailees, did not exercise the necessary degree of care to protect Plaintiffs' property. Rather, they engaged in acts that were potentially injurious to the young Mare. (TR 1/10 at 23-25, 30). Therefore, Plaintiffs prevail on Count Six of their Complaint.

### H. Eighth[15] Claim - Declaratory Relief

Plaintiffs seek a declaration of "rights and obligations concerning the Mare, including all breeding and reproductive rights in such Mare and products thereof." (Co at 45). Specifically, Plaintiffs seek a declaration that Ajman Stud was the owner of the Mare when she was bred to produce RD Versaria.

A.R.S. § 12-1831[16] provides that courts "shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed . . . [and] the declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." However, because declaratory judgments are procedural, when brought in federal cases of diversity such relief "must be converted to a claim brought under the Federal Declaratory Judgment Act [28 U.S.C. §§ 2201-2202]." *Mardian Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, No. CV-05-2729-PHX-DGC, 2006 WL 2456214, at *4 (D. Ariz. Aug. 22, 2006). In determining whether to issue a declaratory judgment, district courts are cautioned that such relief should be denied "when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *See United States v. Washington*, 759 F.2d 1353, 1357

---

[15] Plaintiffs plead no Seventh Claim, thus the Court will use the numeric title noted in their Complaint. (Doc. 1-1 at 45).

[16] In seeking such relief, Plaintiffs, erroneously cite "A.R.S. § 12-1801 et. al.," the preliminary injunction statute.

(9th Cir. 1985)(en banc). If the declaratory judgment would be a redundant of a claim or claims, a district court should exercise its discretion to dismiss.

Plaintiffs declaratory judgment request, although imperfectly pled, is not redundant of their claims. Indeed, the declaration is sought because Defendants' false claims, material misstatements, and back-dated documents relating to the Mare's ownership and breeding resulted in additional harm to Plaintiffs. Currently, the AHA does not credit Plaintiffs as owning the Mare when she was bred to produce RD Versaria. The AHA instead erroneously credit Stonewall Farms for that breeding due to Defendants' false filings. Thus, Plaintiffs prevail on Count Eight of their Complaint. The Court issues the following declarations:

    1)    Plaintiffs Sh. Ammar and Ajman Stud owned La Bella Versace on March 6, 2012, and when she was bred to Aria Impressario on March 16 and 17, 2012, and

    2)    Plaintiffs Sh. Ammar and Ajman Stud owned La Bella Versace at the time of her embryo flush that produced R.D. Versaria.

## I.    Damages

Plaintiffs claim that they are entitled to $1,690,000.00 in compensatory damages. Plaintiffs also claim an unspecified award of punitive damages because Defendants acted to defraud them and then concealed their conduct. Defendants state that Plaintiffs specified damages amount is speculative and thus cannot be awarded.

### 1.    Legal Standards

In Arizona, the burden is on the Plaintiff to show the amount of their damages with reasonable certainty. *Harris Cattle Co. v. Paradise Motors, Inc*. 104 Ariz. 66 (1968) (citing *Jacob v. Miner*, 191 P.2d 734 (Ariz. Ct. App. 1948). However, "certainty in amount of damages is not essential to recovery when the Fact of damage is proven." *Id*., (citing *Story Parchment Co. v. Paterson Parchment Paper Co*. 282 U.S. 555, 51 (1931)). In other words, where a party has suffered damage, "a more liberal rule should be applied in allowing the court or jury to determine the amount of damage than should be applied in

weighing evidence on the question of whether or not the acts complained of will result in any damage[.]" *Story Parchment, Co.*, 282 U.S. at 51. Plaintiffs succeeded in proving that Defendants breached the covenant of good faith and fair dealing, engaged in fraud and deceit, breached their fiduciary duties, engaged in conversion, and breached the duty of bailment. Therefore, Plaintiffs are entitled to an award of damages.

To determine the amount of damages, the Court is guided by the above principles, and the law governing damages for the specific claims. For example, once a fraud claim is established, damages are measured under the "benefit of the bargain" rule. *See Lutfy v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 504 (1941). This is calculated by taking the value of the item in question had the representation been true and subtracting the actual value at the date of the sale. *Smith v. Don Sanderson Ford, Inc*, 439 P. 2d 837 at 392 (Ariz. Ct. App. 1968). However, a claimant may also recover on "any consequential damages that may have proximately resulted from the fraudulent conduct of the seller." *Bechtel v. Liberty Nat'l Bank*, 534 F.2d 1335, 1341 (9th Cir. 1976) (citing *Ashley v. Kramer*, 8 Ariz. App. 27 (Ariz. Ct. App. 1968); *Cole v. Gerhart*, 5 Ariz. App. 24 (Ariz. Ct. App. 1967). Damages under claims of conversion and bailment are typically related to the reasonable value of the property that was not returned or damaged. *See Inter "K" N.V. v. UPS Supply Chain Sols., Inc.*, 2011 WL 5826046, at *2 (Ariz. Ct. App. Nov. 18, 2011).

### 2. Analysis

Plaintiffs successfully claimed that Defendants' fraud and deception devalued the contract's purpose by claiming the Mare had never been bred and was without a reservation of embryo rights. Although Defendants ultimately delivered the Mare, she was not as advertised. Thus, Plaintiffs are entitled to damages for Defendants' fraudulent inducement. Plaintiffs are thus entitled to reimbursement of the $75,000.00 contract price. This award considers that Plaintiffs did not receive the full benefit of their agreement.

Plaintiffs argue that Defendants damaged them in the amount of $1,690,000.00. Plaintiffs' rely on expert testimony to establish this amount. The amount is derived from the estimated value of six foals produced by the Mare once she was delivered in late May.

The expert testimony also established that embryos have a 90% survival rate past the gestation period. Nancy Gallun testified that two embryos per month could have been extracted from the Mare. Plaintiffs' claim that from early March through the end of May she could have produced five foals. Plaintiffs estimate the value of each foal is $258,000.00 based upon the estimated value of foals produced by the Mare after she was delivered. *See* (Doc. 128 at 18). The estimated value of the foals ranges from $100,000.00 to $300,000.00. The value of the two foals produced by the Mare and Vervaldee are $300,000.00 - $500,000.00 for AJ Barari, and $150,000.00 for AJ Bella Vervaldee. Therefore, a more reasonable estimate for foals produced between the Mare and Vervaldee is $ 200,000.00.

The Court is mindful that Plaintiffs knew that the Mare was in Defendants possession through the end of March, and they did not take affirmative steps to mitigate their potential losses by having her delivered to Gallun Farms. Thus, the Court will only consider the potential lost breeding opportunities for April and May. Defendants are liable for the value of four foals for a total of $800,000.00.

Finally, the record supports an award for wrongful conversion and/or bailment. While the Mare was in Defendants care and control, they permitted her to be bred to Aria Impresario. The breeding produced RD Versaria, who was sold for $100,000.00 and a reserved embryo right, just eleven-days after birth. Defendants wrongful conduct thus resulted in a quantifiable loss to Plaintiffs of $100,000.00.

**J**.     **Punitive Damages**

Plaintiffs also seek an award of punitive damages. Under Arizona law, punitive damages may be awarded for breach of fiduciary duty if the defendant's conduct reaches requisite level of culpability. *Rhue v. Dawson*, 173 Ariz. 220 (Ariz. Ct. App. 1992). Because Arizona follows the "benefit of the bargain" rule, punitive damages are only appropriate when "the conduct of the wrongdoer is wanton, reckless or shows spite or ill will." *Ulan v. Richtars*, 8 Ariz. App. 351, 358–59 (Ariz. Ct. App. 1968) (quoting *Lutfy*, 57 Ariz. at 504) (internal quotation marks omitted). To recover punitive damages under Arizona law, however, "something more is required over and above the 'mere commission

of a tort.'" *Agilysys, Inc. v. Vipond*, 2006 WL 2620103, at *3 (D. Ariz. Sept. 13, 2006). In other words, a plaintiff must prove by clear and convincing evidence that the defendant engaged in "aggravated and outrageous conduct with an evil mind." *Id.*

The Court finds by clear and convincing evidence that Defendants acted with the intent to deprive Plaintiffs of the benefit of their bargain, to enrich themselves at the expense of devaluing Plaintiffs' benefits, and then acted to cover-up their conduct. The Court finds the conduct "reprehensible" and that Defendants acted "with an evil mind." *Security Title Agency Inc. v. Pope*, 200 P.3d 977 at 995 (Ariz. App. Div. 1 2008) (citations omitted).

First, the record evidence shows that Defendants purposely created an after-the-fact false contract purporting to reserve themselves embryo rights to the Mare. (Tr. Exh. 17). Second, once they entered into the contract, Defendants purposely interfered with Plaintiffs' rights by rushing to aggressively extract embryos from the Mare in a way that could injure her. Then, they falsely claimed Stonewall Farms owned the Mare when she was bred to Aria Impressario. Next, they filed false documents with the AHA to ensure Stonewall Farms, not Plaintiffs, were credited for the breeding that produced RD Versaria.

The Court has considered the Defendants' prior conduct, which involves the buying and selling of Mirajj and resulting deprivation of embryo rights to Demarteau; recklessly entering into a joint contract with Huggins which resulted in the deprivation of rights to Linderman and selling Pierce a horse that they did not own. Plaintiffs fell prey to Defendants' pattern and practice of: concealing breeding rights during horse sales, concealing embryo transfers from interested parties, and manipulation of the AHA records process. Defendants failure to disclose material facts and attempt to cover-up their conduct was no innocent mistake. Rather it was a deliberate and knowing act intended to perpetuate a fraud and deceit. Accordingly, Defendants shall pay Plaintiffs $100,000.00 in punitive damages.

Accordingly,

**IT IS HEREBY ORDERED denying** Defendants' Motion to Dismiss (Doc. 97)

1    and **granting** Defendants' Motion for Leave to File DVD (Doc. 98);

2         **IT IS FURTHER ORDERED granting** judgment for Plaintiffs and against

3    Defendants on counts two, three, four, five, six and eight of Plaintiffs' complaint (Doc. 1-

4    1) and granting judgment in favor of Defendants on count one of the Plaintiffs' complaint.

5         **IT IS FURTHER ORDERED** that Defendants shall pay damages to Plaintiffs in

6    the amount of $975,000.00 in compensatory damages;

7         **IT IS FURTHER ORDERED** that Defendants shall pay Plaintiffs $100,000.00 in

8    punitive damages.

9         **IT IS FINALLY ORDERED** that the Clerk of Court shall kindly enter judgment

10   accordingly.

11        Dated this 30th day of August, 2019.

12

13

14   _____

15   Honorable Diane J. Humetewa
     United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28